In re R. Richard RISO, Debtor.

Donald H. FRANCIS, Plaintiff,

v.

R. Richard RISO, Defendant.

Bankruptcy No. 84–340.
Adv. No. 84–107.

United States Bankruptcy Court,
D. New Hampshire.

April 16, 1987.

See also 58 B.R. 978.

Mark Vaughn, Manchester, N.H., for plaintiff.

Victor Dahar, Manchester, N.H., for trustee.

Mark Berman, Boston, Mass., U.S. Trustee, for debtor.

MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding came on for trial over a four day period on the plaintiff's Complaint, Amended Complaint, and Second Amended Complaint (all of which

remain relevant and all of which are collectively referred to herein as the "Complaint") and defendant's answer to same. Subsequent to the trial the parties submitted legal memoranda and the court then took the matter under submission for the rendering of a decision.

The plaintiff's Complaint seeks to have this court deny Mr. Riso a general discharge pursuant to § 727(a)(2)(A) and/or § 727(a)(5) of the Bankruptcy Code. These sections of the Code provide in relevant part as follows:

§ 727. Discharge.

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

(2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

\* \* \* \* \* \*

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; ...

More particularly, the plaintiff alleges that within one year of the June 7, 1984 filing of Mr. Riso's petition in bankruptcy[1], he embarked on a scheme with his wife, Beatrice Riso, to transfer to her his interest in all assets of value in order to intentionally hinder, delay, or defraud the major creditor of his estate, the plaintiff, Donald H. Francis. Mr. Francis contends that the device the debtor used to accomplish this scheme was an agreement entered into on January 9, 1984, under which the debtor-defendant and Beatrice Riso agreed to the

transfer to her of certain valuable assets, and the subsequent transfer of said assets. In Count II of his Complaint Plaintiff Francis further alleges that the debtor has failed to satisfactorily explain the loss or deficiency of certain assets from those he possessed in December 1981 and April 1982 —more particularly, loans to his two sons, Kenneth and Ronald Riso, totalling $140,000; automobiles and other personal property totalling $50,000; the decrease in value of real estate transferred to Beatrice Riso; and other assets transferred to Beatrice Riso pursuant to the January 9, 1984 agreement between them. The plaintiff also takes the position that since the filing of his Complaint in this adversary proceeding, he has additionally discovered the omission of at least $3,000 in 200 shares of Diamond Shamrock stock and the omission of a home in Goodland, Florida, owned by Mrs. Riso.

Mr. Riso answered Mr. Francis' Complaint denying that he transferred assets to his then-wife, Beatrice, with fraudulent intent and took the position that the plaintiff has failed to produce clear and convincing evidence that Mr. Riso had an actual fraudulent intent vis-a-vis his creditors when he transferred property to Beatrice Riso. Rather, defendant contends that the evidence shows that Mr. Riso merely intended to fairly divide his marital estate when his marriage to Beatrice came to an unquestionable end. As to the second count of Mr. Francis' Complaint, the debtor denied that he failed to satisfactorily explain the loss or deficiency of any asset from his estate within the meaning of the pertinent statutory provision.

## BASIC FACTS

Richard and Beatrice Riso met while working at the MayWood Chemical Works in New Jersey—she as a purchasing agent and he as a chemist. They were married in 1941. At the time of their marriage they

[1]. The debtor-defendant, R. Richard Riso, filed a petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida on June 7, 1984. On August 8, 1984, after a hearing on a motion to transfer filed by Mr. Francis, the Honorable Thomas C. Britton, U.S. Bankruptcy Judge transferred Mr. Riso's Chapter 7 case to the United States Bankruptcy Court for the District of New Hampshire.

had few assets. Over the years however, Beatrice received a number of substantial inheritances from her family. In contrast, Mr. Riso inherited during the course of the parties' marriage only a few hundred dollars from his father. Following their marriage Beatrice and Richard Riso both continued to work at the same chemical firm in New Jersey for a few years, following which Mrs. Riso left the outside labor market for approximately 11 years during which the Risos had five children. Mrs. Riso returned to office work once the parties' children were older and held a number of positions with various companies in New Jersey. In her jobs Beatrice Riso was usually involved in control of inventory, purchase orders, shipments, etc., and over the years has developed self-taught skills in doing bookkeeping work and related office work concerning inventory control, purchase orders and the like.

At the time of their marriage, while the Risos had few assets, Beatrice was able to borrow or received as a gift from a relative, $2,000 to put down on the purchase of a $6,000 home. The original home purchased with the $2,000 deposit in 1942 was sold and eventually led to the Risos building a home in Oradell, New Jersey in 1956. The Oradell, New Jersey home was eventually sold for $156,000 in 1981.

The Risos' relationship was not always one of marital bliss. During the course of their marriage they had numerous arguments at various times including an incident in the 1950's in which Mr. Riso left for a period of a month or so and obtained his own apartment. In another incident in the 1960's Mrs. Riso took the five children and started off for Florida in a station wagon but turned back when she reached Baltimore. There were miscellaneous other spats between them but each time they reconciled and remained together.

In 1975, by taking everything they owned, Richard and Beatrice Riso purchased a division of Stephan Chemical. The Risos pledged everything they owned for bank loans to get the new company off the ground, including a mortgage on their home. The new company—"Maybrook, Inc."—was to do research and development of various lanolin-related chemical products for the cosmetics industry. Beatrice and Richard Riso set up the new business in their Oradell, New Jersey home by converting a long room on the top of the house into an elaborate laboratory and using other portions of the room for office work. Mr. Riso did the chemical formulating and Mrs. Riso did the administrative work for the new company. Mrs. Riso, however, was never paid by Maybrook, Inc., for her office work. On the advice of counsel, the stock of Maybrook was not put in Mrs. Riso's name although the Risos understood that the Maybrook stock, like all other assets they acquired by joint effort during their marriage, was owned by them jointly.

Maybrook, Inc., was a quite successful venture and the company became well-known in the cosmetics industry. Maybrook's business grew steadily during its early years through 1978 and continued to grow steadily with an increase in gross sales every year, including the year of 1983.

During 1978, Beatrice Riso started to urge her husband to bring other people into the company, so that he would not have to work such long hours. She was concerned about his health at his advancing age, and wanted him to live to enjoy the retirement they were planning in Florida. She encouraged him to bring into the firm as co-owners, the plaintiff, Donald Francis, and one Ivar W. Malmstrom. Plaintiff had worked with defendant at Stephan Chemical from 1959 to 1974 when Francis left that company. Francis was basically a business or financial man and was not technically qualified in chemistry or other scientific matters. Malmstrom was a salesman that they knew from another company.

The debtor at first resisted bringing anyone into the company because he liked his "small operation". Additionally, he and Beatrice enjoyed working together in their home. However, he eventually agreed with Beatrice that they should bring Malmstrom and Francis into the company.

On or about December 13, 1978 an agreement was struck by which Malmstrom and

Francis each acquired a one-third interest in Maybrook, leaving Richard Riso with the other one-third stock ownership i.e., 300 shares split among each of them at 100 shares each. The new partners were obligated to pay under the agreement $175,000 each for their shares. Ultimately Malmstrom paid $150,000 and Francis ultimately paid $125,000 before the disputes among the parties surfaced, as related below. In conjunction with his purchase, Mr. Francis became an officer and director of Maybrook, Inc., and entered into a certain Employment Agreement and a certain Shareholders Agreement dated December 13, 1978.

From the outset there were difficulties in the relationships between the new owners and Beatrice Riso. Plaintiff, who was brought in to head up the financial end of the business, became Mrs. Riso's superior. Francis and Mrs. Riso disagreed about many things, including the accounting system for Maybrook, Inc.

Initially it was understood that Beatrice Riso would resign as an officer and director of Maybrook, which she did, but that she would remain to do essentially the bookkeeping and related work that she was doing in New Jersey. It was further understood that Francis would build and develop a manufacturing plant in Massachusetts and that he would be located there. Malmstrom was to work as a sales manager in New Jersey and all three of them had plans for a new building, in New Jersey, to house both Malmstrom's sales offices and Richard Riso's laboratory.

The friction between the new co-owners and Beatrice Riso developed further, culminating in September or October of 1979, in Francis' successful initiation of action requiring that Mrs. Riso leave the company that she had started with her husband four years previously. There was a corporate resolution voted by Francis and Malmstrom, requiring Beatrice Riso to withdraw and not to do any further work for the company. Beatrice Riso still had not received any pay from Maybrook, Inc. for her work, although she had worked there on a full-time basis from 1976 through her oust-er. She did withdraw from active involvement with Maybrook commencing in late 1979.

Also, a little later in the fall of 1979, Malmstrom and Francis joined together to vote a corporate resolution requiring the debtor to move to the Maybrook plant now located in Lawrence, Massachusetts. Richard Riso did so in December 1979—living at first in a rented apartment in that area. Mrs. Riso was unhappy about this resolution in view of the original understanding among the parties that she and her husband would remain in New Jersey. Further she had no desire to move north to Massachusetts where she had no family or other connections. Nevertheless, Mr. Riso moved to New Hampshire to be closer to the Maybrook manufacturing facility in Massachusetts, and left Mrs. Riso behind to take care of selling the Risos' Oradell, New Jersey home. Months later Beatrice Riso reluctantly joined her husband in a rented apartment in New Hampshire.

In July 1981 the Risos' Oradell, New Jersey home was sold for $156,000.

On January 8, 1982, Francis himself was ousted or "terminated" from his employment at Maybrook, Inc., by a resolution of Maybrook's Board of Directors. The defendant and Malmstrom took the position that they also terminated Francis' stock ownership as well, while Francis takes the position that he still retained his stock interest. On March 31, 1982, Francis brought suit in the United States District Court for the District of New Jersey against Mr. Riso and Ivar Malmstrom, Jr., personally, seeking both damages and injunctive relief arising out of his purchase of Maybrook shares and his "termination" from Maybrook, Inc. By order dated October 26, 1982 certain portions of Francis' Complaint were found to be arbitrable by the New Jersey Federal District Court Judge and a demand for damages in arbitration was initiated by Francis on January 5, 1983.

Once Mr. Francis had been removed from active involvement in Maybrook, Mrs. Riso was brought back into the company to perform the financial office duties that she

had previously performed there—which had been performed by Francis after her ouster. She again was not paid for her work by Maybrook, Inc.

By September of 1983 Beatrice Riso and Ivar Malmstrom developed some serious friction between them related primarily to her questioning of his expenses as a salesman and the like. In late September of 1983, Mr. Malmstrom used the occasion of Mr. Riso being in California to order Beatrice Riso off the Maybrook premises. Further, on September 20, 1983, Malmstrom called a meeting of all the Maybrook plant employees while both Risos were away, and announced that Mrs. Riso was not an employee of Maybrook, was not working there anymore, and that the employees should not take any instructions from her.

When Mr. Riso did not take his wife's part vis-a-vis Malmstrom upon returning, this was the "straw that broke the camel's back" and *on Columbus Day weekend, October 8–10, 1983*, Beatrice Riso left her husband. She had her son Greg, who lived in Lawrence, Massachusetts, pick her up and take her to his house to stay. While at Greg's, Beatrice talked with him about her problems and the Maybrook situation and Greg encouraged his mother to get a divorce. *At that time Mrs. Riso called her son Kenneth in Florida for the name of a divorce lawyer there.* While Mrs. Riso did not return to work at Maybrook after the Columbus Day weekend, she did return to live with Mr. Riso in their home in Windham, New Hampshire following that weekend.

*On October 20, 1983* the American Arbitration Association mailed its Arbitration Award to the attorneys for the parties granting plaintiff Francis $1,913,404 in damages against Richard Riso and Ivar Malmstrom jointly and severally. The American Arbitration Association's Award was received by the attorney who represented Mr. Francis in the arbitration on October 24, 1983. On October 24, 1983 Mr. Francis' attorney hand-delivered to Mr. Riso's attorney in New York, a letter demanding payment of the Arbitrators'

Award. Mr. Riso became aware of the Award shortly after his New York counsel received notice of it.

Mr. and Mrs. Riso took a vacation in Florida during the Thanksgiving holiday in 1983, spending the holiday in their Marco Island condominium. During that holiday period, on November 28, 1983, Beatrice and Richard Riso filed a Declaration of Domicile stating that they had been residents and domiciliaries of the State of Florida since December 22, 1981. Francis contends that same was merely part of the debtor's scheme to put his assets beyond the reach of Francis in this bankruptcy proceeding, while the debtor claims that the Declaration of Domicile was necessary to permit the Risos to vote in the 1984 presidential primary and general election, and to take advantage of a tax deduction Florida permits homestead owners. It appears to this court that tax concerns were paramount to the Risos in filing their declaration of Florida domicile on November 28, 1983, especially in light of the fact that *on July 14, 1983* Beatrice and Richard Riso had filed an amendment to their 1981 federal income tax return to show their primary residence for "capital gain rollover" purposes to be their condominium on Marco Island in Florida. This occurred months before the announcement on October 20, 1983 of the Arbitrators' Award. As mentioned above, the Risos had sold their Oradell, New Jersey home in July of 1981 and had realized a substantial capital gain thereon.

Following the Thanksgiving holiday, Beatrice and Richard Riso returned to live together at their home in New Hampshire and Mr. Riso returned to work at Maybrook in Lawrence, Massachusetts.

During the Christmas holiday in 1983, Mr. and Mrs. Riso traveled again to Florida to vacation. While there, Beatrice Riso on December 28, 1983 first spoke with the Florida attorney, J.B. Taylor, of Naples, Florida, concerning divorce. She that same day petitioned for divorce against Mr. Riso. Beatrice had received the name of Mr. Taylor from her son Ken, who had a dental practice in Naples. Beatrice took with her various papers relating to the divorce from

Mr. Taylor's office that Mr. Riso ultimately was to give to his own attorney in Massachusetts. That attorney, a Mr. James, was admitted to practice in Florida as well as in Massachusetts.

The Risos then travelled back to New Hampshire together, returning on January 4, 1984. They went over their assets and worked up a split of the assets which became "Exhibit A" to an "Agreement" signed by them on January 9, 1984. It is the division of property pursuant to this January 9, 1984 Agreement which Francis alleges was done with the intent to hinder, delay and defraud him of his judgment debt against Mr. Riso. The debtor claims that the January 9, 1984 agreement was intended to, and did result in, a 50–50 split of the parties' marital assets.

The January 9, 1984 Agreement, on its face, gave Beatrice and Richard Riso each approximately $600,000 in value of property—Mr. Riso keeping those assets related to Maybrook, Inc., his IRA and his pension; Mrs. Riso keeping the other assets such stocks, bonds, real estate and cash as well as her IRA. The believability of Mr. Riso's testimony that he viewed this transaction as a "50–50" split—and had no intent to hinder, delay or defraud Francis by it—depends primarily upon the validity of his valuation of his Maybrook stock at $500,000 in the transaction. That stock comprises the single largest asset which he kept under the January 9, 1984 Agreement.

Nothing in the January 9, 1984 Agreement nor any other evidence indicates that the property division made by that Agreement was contingent upon the Risos' ultimately divorcing, although the agreement does recite that the parties were in the process of getting a divorce, and the Agreement was subsequently incorporated into the Risos' final divorce decree of April 12, 1984 issued by the Florida divorce court.

When the Risos returned to New England in January of 1984, Mr. Riso returned to their home in Windham, New Hampshire, and Mrs. Riso moved in with her son Greg in Lawrence, Massachusetts. During the month of January, 1984, the parties proceeded to execute the documents necessary to carry out the property transfers specified in their January 9, 1984 Agreement. Although staying with her son Greg in Massachusetts, Mrs. Riso made occasional visits to the Windham, New Hampshire home to "tidy things up", and separate her personal items for transfer to Florida, etc. The Risos did not announce their divorce proceedings to their business associates for some time.

During the last week of January, 1984, the office manager at Maybrook attempted to commit suicide and the defendant asked Beatrice Riso to come back to work temporarily until they could get a replacement. She did so and worked approximately five weeks into March of 1984. Mrs. Riso's handwriting appears on at least 14 Maybrook, Inc., checks through March 16, 1984.

During the period February 26, 1984 through March 5, 1984, the Risos travelled together to Florida with the idea that they would both attend a cosmetics industry convention at Boca Raton. However, only Richard Riso went to the convention and Beatrice went to stay at the Florida condominium on Marco Island. The Risos returned together to New Hampshire.[2]

On March 22, 1984 the Federal District Court in New Jersey entered a judgment confirming the Arbitrators' Award to Francis. This judgment was subsequently amended by that court on April 5, 1984, but again confirming the Arbitrators' Award to the plaintiff.

2. While in Florida, Mr. Riso listed "wife" as an additional renter of a rental car and his local address was listed as "Prince Condominium, Marco Island", Beatrice Riso's home. While in Florida during this period of time, calls were made by Mr. Riso from the Prince Condominium which had been transferred to Mrs. Riso pursuant to the January 9, 1984 Agreement. On March 7, 1984 Mr. Riso rented a car from First Auto And Lease Corp. for two days and listed "Beatrice Riso" as another driver under the rental agreement. Additionally Mrs. Riso allowed the defendant to use a house located in Goodland, Florida, inherited from her father as a "mail drop".

On March 24, 1984, the Risos went together to a cosmetics industry ball in Boston and were seen dancing together. They both testified that they went together because they did not want to create additional adverse publicity about Maybrook in the industry. The squabbles between the Risos and Francis and Malmstrom had become common knowledge. The person putting on the ball was a close friend and they did not want to let her down. While at the Risos' New Hampshire home in the Spring of 1984, Beatrice Riso reconciled various entries in Richard Riso's personal checkbook. The last entry in her handwriting is May 2, 1984.

In April of 1984, as mentioned above, the U.S. District Court in New Jersey amended its decision, but the amended decision again confirmed the Award of the Arbitrators to Donald Francis in the amount of $1,913,404 plus interest. On April 12, 1984 a final judgment of divorce was issued by the Circuit Court For Collier County Florida dissolving the marriage of Beatrice and Richard Riso. This final judgment of divorce incorporated and approved the Risos' Agreement of January 9, 1984 dividing their marital property.

In line with his argument that the Risos' January 1984 property division was merely a scheme to defraud him of his judgment claim, Mr. Francis relies heavily on the lack of acrimony between the Risos in their divorce proceeding. The Risos' divorce proceedings in Florida were uncontested. Mr. Riso was represented in the Florida divorce proceeding by Attorney John A. James, Jr. who, although a member of the Florida Bar, practices law in Lawrence, Massachusetts. Mr. Riso testified that neither he nor his lawyer attended any of the proceedings in the Florida divorce action, and in fact waived service of process in that proceeding.

Francis also points to facts such as an instance in June of 1984 in which an individual called Mr. Riso at the New Hampshire house and Beatrice Riso answered the phone saying that "Rocky is out in the garden ...". Similarly brought out by Francis during the trial, is the fact that while the Risos' Florida divorce decree provided for Beatrice Riso to receive alimony payments from Richard Riso of $1,000 per month, Richard Riso has made only one of the $1,000 monthly alimony payments and Beatrice has not "bothered" him about the rest. The debtor testified that he simply does not have the money to make any further alimony payments. Both Risos testified that "the marriage is over" and that they have no plans to get back together. They specifically deny that they "cooked up the divorce as a part of any scheme." The Risos have not resided together at any time since the summer of 1984, and they have not had intimate marital relations since July of 1983.

Mr. Riso now resides alone, in Stubenville, Ohio, while Mrs. Riso lives in the Prince Condominium in Marco Island, Florida. While they occasionally see each other at family gatherings they are no longer involved in each other's affairs and generally lead separate lives. Richard Riso does consulting work in a company (which has no other employees) formed in August of 1985 by himself and all five of his children. He drives a 1969 Buick.

There is no evidence in this record that would support a finding that the Risos were not truly divorced in 1984. There is likewise no evidence in this record that would support a finding that they have any intention of reuniting in the future or that Richard Riso has shared, or expects to share, in the properties or income assets transferred to Beatrice Riso under the January 9, 1984 Agreement.

## CONCLUSIONS

For the debtor to refute the § 727(a)(2)(A) attack, it is not necessary for this court to find *as a matter of ultimate fact* that the properties Richard Riso retained in the January 9, 1984 Agreement *did* have the approximate $600,000 value he ascribed to them.[3] Since the touchstone

---

3. This adversary proceeding is not a § 548 fraudulent transfer attack involving lack of a

"reasonably equivalent value" where the values of properties *would* be directly relevant. Cf. *In*

of that statutory provision is whether he transferred property "with intent to hinder, delay or defraud" his creditors, the key question before the court is whether Richard Riso *believed* on January 9, 1984 that the properties he retained reasonably matched in value those being transferred to his wife. Cf. *In re Glaser*, 49 B.R. 1015, 1019 (Bankr.S.D.N.Y.1985); *In re Taylor*, 514 F.2d 1370 (9th Cir.1975) (prior Act but similar statutory provision barring discharge for intentional fraudulent actions). The court in determining what the debtor actually believed and intended is not bound of course by the self-serving testimony of the debtor in that regard, but can test that asserted belief against appropriate interferences to be drawn from all the surrounding objective factual circumstances. *In re Devers*, 759 F.2d 751, 754 (9th Cir.1985).

 The parties differ on the appropriate burden of proof that Francis must meet to bar Riso's discharge. Since a fraud element is involved, Riso contends that the objecting creditor's proof must meet a "clear and convincing" standard, citing in that regard *In re D'Annolfo*, 54 B.R. 887, 889 (Bankr.D.Mass.1985), and a long series of other decisions to that effect. Francis argues that a mere preponderance burden is required. There are a few cases which so hold. See, e.g., *In re Clausen*, 44 B.R. 41 (Bankr.D.Minn.1984); *In re Baiata*, 12 B.R. 813 (Bankr.E.D.N.Y.1981).

This court left open the question of whether a higher, clear and convincing standard was required in establishing fraud-type discharge objections in its recent decision in *In re Carney*, 68 B.R. 655, 657 (Bankr.D.N.H.1986).

After further review of the authorities I conclude that the appropriate standard is preponderance of the evidence—even in the fraud situation. See, by analogy, *Matter of Mascolo*, 505 F.2d 274 (1st Cir.1974) (fair preponderance of evidence all that is required to bar discharge for false oath in schedules). This decision is not as important in practical terms as it might first

seem, however, since the case law establishes that a debtor is entitled to a starting presumption that most people are honest and do not ordinarily engage in fraudulent activities. *In re Huff*, 1 B.R. 354 (Bankr.D. Utah 1979); 37 C.J.S., *Fraud*, § 94 (1985). Aside from that common sense presumption, however, I believe that *Huff* and its succeeding line of cases erred in going further to impose a clear and convincing *burden of proof* standard.

The misciting of the C.J.S. treatise discussion in this regard in the *Huff* decision is set forth in *In re Curl*, 49 B.R. 302, 304–306 (Bankr.W.D.Mo.1985), in an analysis which I find clearly convincing and therefore adopt. Objecting creditors are *also* entitled to a presumption, of fraudulent intent, after showing gratuitous transfers of assets in the shadow of a bankruptcy filing. *In re Clausen*, supra, at pp. 44–45. I believe that clarity of thought in the face of such conflicting presumptions will be furthered by use of the preponderance standard in fraud-type discharge objections.

 In the present case there is no question that Francis met his initial burden by the evidence he presented as to the timing of the transfers and the surrounding circumstances of the arbitration award and the affairs of Maybrook, Inc. Indeed, considering that showing, there was no question at the conclusion of the plaintiff's case that the debtor had "a lot of explaining to do" to avoid the inference of fraudulent intent.

On balance I conclude that Mr. Riso, a physicist with so little business interest or aptitude that he could not even balance a checkbook, *did* introduce evidence sufficient to refute the inference of fraudulent intent. Likewise, the ultimate burden of persuasion remaining with the plaintiff, I conclude that the plaintiff failed to establish the grounds for barring discharge by the required preponderance of the evidence. The plaintiff's contention in its post-trial brief that the *burden of persua-*

*re Sorlucco*, 68 B.R. 748 (Bankr.D.N.H.1986). In such a case, the equitable and inchoate rights of a wife stemming from a 42–year marriage to

achieve perhaps more than a 50–50 split would *also* have to be factored into the equation. *In re Sorlucco*, supra.

*sion* had shifted to Riso is not correct. *Bankruptcy Rules,* Rule 4005; *Federal Rules of Evidence,* Rule 301; Cf. *Matter of Dee,* 6 B.R. 784 (Bankr. W.D.Pa.1980).

After hearing the testimony of Mr. and Mrs. Riso at the trial, and even after testing their credibility against the negative inferences that might be drawn from the surrounding factual context, I am convinced that the history of the marriage, and particularly the occurrences in 1983 *before* the handing down of the Arbitration Award, were sufficient to, and did, cause the termination of their marriage. I believe that Mrs. Riso would have gone forward with the divorce action in December of 1983, with or without the Arbitration Award development, and that Mr. Riso would not have contested the divorce even if there had been no Arbitration Award to Francis on October 20, 1983, and would have reached essentially the same property division agreement.

As indicated earlier, there is no evidence in this record indicating that the divorce between Mr. Riso and Mrs. Riso was "phony" or in any way not a true divorce between the parties. The plaintiff himself in his reply brief states that he is not attacking the divorce, per se, but throughout the trial and in his briefs has emphasized repeatedly the various ongoing contacts the debtor and his wife had during the period of January to June of 1984. As indicated above, the plaintiff points to the "lack of acrimony" between the parties as a suspicious circumstance. I find on the contrary that there was nothing suspicious in the conduct of these parties to a 42 year marriage in going about their divorce proceedings in a reasonably amicable and unemo-

tional matter in the circumstances. As for the property division agreed to between the parties, expert evidence was received corroborating Mr. Riso's belief that a "50–50" split would be appropriate in view of the length and context of the Riso marriage.

This leaves as the key issue whether Mr. Riso could have truly believed that the property division included in the January 9, 1984 agreement was in fact a more or less equal split of the properties of the marital partners. This comes back again primarily to the question of the value of Mr. Riso's stock interest in Maybrook, Inc., which was listed as $500,000 in value in the property division agreement. If Mr. Riso could have believed that stock had that value at the time of the January 9, 1984 agreement, the fact that Mrs. Riso received the more liquid assets and the real estate in the property division would not take away from Mr. Riso's lack of fraudulent intent.[4] The evidence is credible that it was more appropriate that Mrs. Riso receive the more liquid assets and real estate since she had no further income producing capacity.

It is tempting to look with hindsight at the events which occurred after January 9, 1984 and conclude that Mr. Riso "must have known" that his Maybrook stock would not produce anything near $500,000 if subsequently liquidated to satisfy Francis' arbitration award in the event that award was ultimately affirmed on appeal.

There are two problems with that temptation. One, Riso cannot be held accountable for the *liquidation* value of that stock because there is nothing to indicate that in January of 1984 any liquidation and termination of Maybrook's business affairs was imminent.[5] Second, the use of "hindsight"

---

4. Francis also contends that Riso could not reasonably have believed that an additional $59,000 asset shown on the January 9, 1984 agreement, as being retained by Mr. Riso, actually had a value in that amount. This asset was listed as a "loan outstanding" from Francis relating to the unpaid balance for his original purchase of one-third of the Maybrook stock. Francis contends that this debt owing by him to Riso was a counterclaim in the New Jersey litigation that was wiped out by the Arbitration Award. However, a close examination of the various orders of the New York District Court, the transcripts of the arbitration hearings, and the Arbitration

Award makes it anything but clear that that debt was wiped out by the Arbitration Award or the subsequent orders of the District Court affirming the award. I find Riso's testimony credible that in January of 1984 he considered that debt for the unpaid portion of Francis' stock purchase still outstanding.

5. Indeed, even at the time of trial Maybrook had not been liquidated. During the course of the bankruptcy proceedings Francis was able to buy Risos' stock for a price of $100,000, and has taken over and continued the business operation of Maybrook, Inc.

is always inherently dangerous in a fraudulent intent case, since the debtor is entitled to a judicial determination based on the factual picture *apparent to him as of the time* of the transaction in question.

Looked at without hindsight, Riso saw a business enterprise which had increased in gross sales in every year from its inception. This was also true of the calendar year of 1983 just completed. Projections for 1984 indicated that a gross sales level of $2,500,-000, being a further increase in sales, was reasonable to expect. While the 1983 profit and loss figures ultimately showed a loss, the company would have shown a small profit if substantial nonrecurring expenses related to the Francis litigation in New Jersey were eliminated.

While the 1984 actual operations failed to meet the sales projections, this drop in sales I find to be more attributable to the continuing litigation and disruption of the management of Maybrook, relating to the New Jersey litigation, as well as new frictions developing between Riso and Malmstrom, rather than any inherent lack of profitability in Maybrook's products and position in the cosmetic industry. Even after the filing of Mr. Riso's individual chapter 7 bankruptcy petition on June 7, 1984, Mr. Riso was able to continue the business operation of Maybrook notwithstanding the adverse publicity from his own bankruptcy filing. He managed its ongoing business operation until November of 1984 when he was removed from his position at Maybrook by the joint action of the chapter 7 trustee for his estate as well as the chapter 7 trustee for Malmstrom's own chapter 7 bankruptcy proceeding in New Jersey. The two trustees installed Francis in place of Riso at Maybrook. Up to that point Riso had been able to assure the trustees that the operation at Maybrook was carrying itself and had turned around.

Riso introduced evidence of several offers to purchase his 100 shares of Maybrook stock during 1983. During the process of the New Jersey arbitration proceeding, before the Arbitrators Award, Malmstrom made an offer to buy out Riso's interest in Maybrook for $500,000, or to sell his interest to Riso for that amount. Riso did not act on that alternative offer at that time. Testimony was also received that in June of 1983 Riso entered into negotiations with two new employees at Maybrook that had acquired 10 percent of the Maybrook stock for $100,000. The employees however were never able to get all the money together necessary to complete this proposed purchase.

Equally important in Richard Riso's view of the value of his Maybrook stock, in January of 1984, was the startling fact that Francis had just obtained an Arbitrators Award in excess of $1,900,000 relating to *his* one-third interest in Maybrook.[6] To achieve this award Francis had put in voluminous evidence before the arbitrators establishing the fine financial performance history of Maybrook and its rosy outlook for the future. While a close examination of that evidence and the arbitration proceedings (although not the terse arbitrator's award itself) would lead an experienced attorney or financial analyst to reject a simplistic conclusion that "if Francis' interest is worth that much mine must be worth at least $500,000" I conclude that that type of reaction would have seemed appropriate in January of 1984 to a person with Mr. Riso's lack of business interest or aptitude.

The evidence also indicates that Riso viewed Maybrook not primarily in terms of ordinary balance sheet analysis of corporate assets and liabilities, but instead as an on-going business enterprise that had paid him $80,000 in salary and bonuses in past years, and which he had every expectation he would continue to receive as long as he owned his interest in Maybrook. In that light, Riso's testimony that he considered the split of assets with Mrs. Riso, leaving

---

**6.** That the Arbitrators Award was surprising in its magnitude is established not only by the testimony of Riso and Malmstrom but is also implied in the length and language of the district judge's decision in New Jersey, affirming the arbitrator's award on the basis of the limited scope of review when acting on an appeal from an arbitrator's award in the federal courts.

him with the ownership of Maybrook, as an even split is also credible.

For all of the foregoing reasons, I conclude that Richard Riso did not act with actual intent to hinder, delay or defraud creditors in entering into the property division agreement with Mrs. Riso on January 9, 1984. In the final analysis, I have had to weigh his credibility on that point by his demeanor and testimony on the stand. Even after considering all the surrounding factual circumstances, and application of a liberal "grain of salt" to his self-serving declarations, I still cannot find that this debtor entered into the transaction in question with the intent requisite to bar discharge under § 727(a)(2)(A) of the Code.

As for the alternative contention by Francis that Riso's discharge should be barred under § 727(a)(5) of the Bankruptcy Code, dealing with a failure to explain satisfactorily any loss of assets prior to the bankruptcy, I believe that that contention is also insufficient on the facts of this case and is based on a fundamental misconception as to the import of that alternative statutory provision. The statute does not require that the debtor make a *proper* explanation as to a *proper* disposition of the assets in question. *In re Nye*, 64 B.R. 759, 762 (Bankr.E.D.N.C.1986) ("the court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper."). In my judgment the debtor in this case has satisfactorily explained the disposition of the various assets in question within the meaning of the statute. In this regard I adopt as my own findings and conclusions the discussion of the evidence included in pages 75–82 of the defendant's post trial brief.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules. A separate judgment will be entered accordingly.