**In re Russell MITCHELL, a/k/a William Mitchell, d/b/a Granite State Trader, Debtor.**

**INDIAN HEAD NATIONAL BANK, Plaintiff,**

**v.**

**Russell William MITCHELL, Defendant. (Two Cases)**

Bankruptcy No. 85–285.
Adv. Nos. 85–80, 85–81.

United States Bankruptcy Court,
D. New Hampshire.

June 4, 1987.

458

I. Michael Winograd, Concord, N.H., for Indian Head Bank.

Bruce Jasper, Newport, N.H., for debtor.

Terrie Harman, Portsmouth, N.H., Trustee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

The two above-captioned adversary proceedings came on for trial on January 27, 1987. Pursuant to this court's pre-trial order of July 29, 1986, regarding *Adversary Proceeding No. 85–80*, commenced by the plaintiff's Complaint To Determine Dischargeability Of Debt, was tried solely on the charge made pursuant to § 523(a)(2)(B) —that the defendant-debtor's indebtedness to plaintiff is nondischargeable due to a false written financial statement.

Pursuant to this court's pre-trial order of July 29, 1986, regarding *Adversary Proceeding No. 85–81*, that matter, commenced by plaintiff's Complaint Objecting To Discharge, was to be tried at the same time as the trial in Adversary Proceeding No. 85–80. In the 85–81 adversary proceeding, the plaintiff alleged that the debtor should be denied a discharge due to his failure to explain satisfactorily the loss of assets from the sale of property in Canterbury, New Hampshire which sale took place within one year before the date of the filing of the bankruptcy petition in this case, i.e., a charge pursuant to § 727(a)(5) of the Bankruptcy Code.

## ADVERSARY 85–80

In Adversary Proceeding No. 85–80, the plaintiff's § 523(a)(2)(B) charge was that in order to obtain a loan from plaintiff bank, the defendant-debtor executed a written personal loan application which was materially false in that it did not list various outstanding loans which the debtor actually owed. For present purposes it is sufficient to focus on one debt admittedly omitted from a March 1984 financial statement submitted to the plaintiff bank, i.e. a second mortgage loan owed to another bank in the amount of approximately $10,000.

The plaintiff's § 523(a)(2)(B) charge also alleges that the personal loan application was relied upon by the plaintiff in making said loans to defendant, and that at the time of his execution of the personal loan application the debtor knew the statements contained therein were not true and complete and intended to deceive the plaintiff.

The plaintiff's evidence at trial on the Complaint To Determine Dischargeability Of Debt tended to establish that the Bank had made loans to defendant-debtor totalling some $12,000 from March to June 1984. More specifically, Mr. LaFlamme, the Bank's witness, testified on cross-examination that the Bank made an initial $5,000 advance to the debtor on March 5, 1984. According to Mr. LaFlamme's testimony, it was this loan which the Bank asserts it would have required to be done on a secured basis, but for the false financial statement submitted by the debtor. This $5,000 loan made in March 1984 was a 90–day note and was paid off by the extension of a new loan to the debtor in June 1984. This June 4, 1984 renewal loan was never repaid by the debtor. Mr. LaFlamme also testified to the Bank's advancing the debtor funds on a installment loan on May 10, 1984, in the amount of $7,000, which constituted the combination and refinancing over 48 months of two previous loans which the Bank had made to the debtor on an unsecured basis on April 29, 1982 and August 29, 1983. Of the proceeds of the May 10, 1984 $7,000 loan, all but $848.76 went to the Indian Head Bank to pay off these two previous unsecured loans. The remaining $848.76 was deposited to a demand deposit account of the debtor's. *See also,* Plaintiff's Ex. 4 establishing the particulars of these transactions between plaintiff and defendant.

The plaintiff's evidence at trial on its § 523(a)(2)(B) Complaint established that on March 5, 1984 the debtor submitted a

written financial statement to the Bank. The Bank requested the new statement at that time because the most recent one which the Bank had was from 1982, and the Bank needed to have an updated statement of the debtor's financial condition. At trial the Bank's evidence was that this March 5, 1984 financial statement was materially false primarily due to the fact that the debtor omitted therefrom the $10,000 second mortgage loan which he owed at that time to the New Hampshire Savings Bank, as indicated above, notwithstanding three separate places on the financial statement form at which the NHSB loan should have been listed.

The Bank's witness, Mr. LaFlamme, testified that if he had known that the debtor had a $10,000 secured loan from New Hampshire Savings Bank, he would not have granted the debtor the $5,000 loan in March 1984 as an *unsecured* loan, but rather would have secured that $5,000 loan with a third mortgage on the defendant's homestead real estate in Canterbury, New Hampshire. While initially Mr. LaFlamme's testimony seemed to be that in *March 1984* the debtor persuaded Mr. LaFlamme not to secure the $5,000 loan on the basis of the debtor's promise that his home was being sold and that the Bank would be paid shortly on all its loans from the proceeds thereof, Mr. LaFlamme ultimately clarified his testimony to specify that the debtor's promise to pay the Bank from the sale of his home was made only at the time of the *May 10, 1984* $7,000 installment loan. Mr. LaFlamme also testified that until March 1984 the debtor had been a good customer of the Indian Head National Bank and until that time all the debtor's loans had been paid as agreed.

In any event, the Bank obtained no new financial statements from the debtor in connection with the funds it advanced him in May 1984 and June 1984, but rather it was Mr. LaFlamme's testimony that the Bank relied on Mr. Mitchell's March 1984 financial statement in making the May and June 1984 loan advances of $7,000 and $5,000 respectively.

The debtor's own testimony as to the specifics of the amounts which he borrowed from the Indian Head National Bank was somewhat unclear due to a number of factors, one of which was that he had had many short term loans from the Indian Head National Bank, mostly on a 90–day note basis, between 1976 and 1984. The debtor did testify that most of those loans were in the $1,000 to $3,500 range but that there were some for $4,000 or $5,000.

As to his failure to list the outstanding $10,000 secured loan with New Hampshire Savings Bank on his March 1984 financial statement, the debtor now readily admits that he did leave this loan out of his application to the Indian Head Bank. The debtor attributed his failure in this regard to the fact that he filled out the application with the Indian Head Bank quickly and following a "three martini lunch." He thus attributes his failure to disclose the second mortgage loan with New Hampshire Savings Bank to the Indian Head National Bank, to a mistake rather than omitting it to fool anyone.

While the plaintiff, in support of its charge pursuant to § 523(a)(2)(B), also offered some evidence concerning undisclosed loans from the debtor's son, from a David Pollard, and from the debtor's former wife, Shirley Mitchell, the Bank's evidence in this regard was inconclusive at best and the court hereby finds that any failure to disclose loans from these other people on the debtor's March 1984 financial statement to the Indian Head Bank, so as to make a materially false written statement to the plaintiff Bank, were simply not proven at trial. Hence, the court hereby finds any allegations in this respect to be inadequate to support the determination that the debtor indebtedness to the Indian Head National Bank is nondischargeable under 11 U.S.C. § 523(a)(2)(B).

However, the court does find that the debtor intentionally omitted the second mortgage loan with the New Hampshire Savings Bank from his March 1984 financial statement to the Indian Head National Bank and that the debtor did so because he was dealing with a new loan officer and

wanted to make sure he got the loan even though he had been forced to go to NHSA for additional borrowing. If the debtor had revealed to the Indian Head National Bank his second mortgage borrowing from another bank, there was a real basis for concern that such disclosure might well have ruined his chances of getting the additional loan from the Indian Head Bank. This court does not believe that the debtor could have forgotten a second mortgage lien of that amount against his house.

The question on the § 523 charge then shifts to whether the Indian Head National Bank *relied* to its detriment upon the debtor's misstatement involving the New Hampshire Savings Bank mortgage loan. In other words, would the Indian Head National Bank have refused a loan if it had known of the secured second mortgage lien to the New Hampshire Savings Bank? Concerning this, the court believes the Bank officer's testimony that had he known of the second mortgage lien to another bank, he would have been concerned about lending any further money to the debtor on an unsecured basis. As the loan officer put it, it was the "net worth in the house" that was of prime importance to the bank in making further loans to the debtor.

The court further believes that the Indian Head National Bank would have required a third mortgage position to protect itself in those circumstances had the debtor revealed them to the Bank. The court is not overlooking the fact that the Indian Head Bank admittedly had been dealing with the debtor since 1976, and had had a good relationship with him, one in which the debtor paid off all loans as due. It is a close question, but on balance the court finds that the Bank was harmed by the debtor's misstatement since the fact that the debtor had gone to another bank for a loan, and had been required to mortgage his home to obtain it, would have been a "red flag" that probably would have led the Indian Head loan officer to refuse to extend anymore unsecured lending to the debtor. That the debtor failed to list the second mortgage debt on the application, despite three separate places where it should have been listed on the form, in the foregoing circumstances, is sufficient in my judgment to bar discharge of the debt to the plaintiff Bank.

### ADVERSARY NO. 85–81

As mentioned above, in its Complaint Objecting To Discharge, Adversary Proceeding No. 85–81, plaintiff's § 727(a)(5) allegation is that the debtor should be denied a discharge due to his failure to explain satisfactorily the loss of assets from the sale of property in Canterbury, New Hampshire. Section 727(a)(5) provides as follows:

(a) The court shall grant the debtor a discharge, unless—

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities ...

In his Statement Of Financial Affairs, filed on June 20, 1985 with his bankruptcy petition, at question 12b thereon, the debtor discloses that he sold real estate in Canterbury, New Hampshire in August 1984 for $55,000.00. He goes on to describe the disposition of proceeds of this sale as follows:

—Centennial Realty, Concord, New Hampshire—$3,300.00
—First Savings & Loan of Franklin—$17,246.18
—New Hampshire Savings—$9,753.63
—Settlement Check—$3,124.00
—Taxes—$396.42
—Residence Tax—$10.00
—Part Of Money Deposited In Indian Head National Bank; Balance Not Deposited In Bank Was Used To Purchase Travelers Checks—$8,641.73
—Paid To David Pollard Of Springfield, Vermont For Loan—$3,325.00
—Paid To Shirley Mitchell For Payment Due Under Divorce Agreement—$2,000
—Repaid Money From Son's Savings Account—$6,500
—Taken As Cash—$4,000

The court notes that this explanation of the disposition of the proceeds of the sale of

debtor's Canterbury, New Hampshire real estate in his Statement Of Financial Affairs, comes to a total of $58,296.96

In his Statement Of Financial Affairs the debtor also stated, in answer to question 14 thereon, that he had suffered theft losses during the year immediately preceding the filing of his bankruptcy petition, in that he had been robbed in Madrid, Spain during September-October 1984, at which time approximately $4,000 was stolen from him. Debtor further stated in his Statement that he had lost approximately $5,000 in gambling losses in London, England during November 1984 through January 1985.

The debtor's testimony at trial was substantially to the same effect as that provided in his Statement Of Financial Affairs, concerning the disposition of the proceeds of the sale of his real property in Canterbury,—with the theft and gambling losses apparently having involved cash coming largely from the money deposited with the Indian Head National Bank or used to purchase travelers checks from the house sale proceeds.

At trial, the debtor testified that he believed his gambling losses had occurred at the Golden Nugget Casino in London, at the Skartis Regency Club in London, and at another London club which he named (the Soams Sporting Club). The debtor further explained that these losses had occurred at a "bad time in my life" during which his "relationship went bad" and he did "a lot of drinking". The debtor was not able to describe exactly how much he won or lost on each day or at each casino, and he kept no diary of winnings and losses by date or other detailed accounting.

As to the $4,000.00 robbery loss, the debtor testified that he was robbed of this money while at the Victoria Hotel located at the Plaza Of Angels, Madrid, Spain in October of 1984. The debtor further testified that he reported this theft to the hotel and that he called the American Embassy. However, when the Embassy advised him

that calling the police would be a waste of time, he did not bother to do this.

By its § 727(a)(5) charge, it is the bank's position that the debtor should be denied discharge completely for his failure to satisfactorily explain his loss of assets. Concerning this charge, the court finds that the debtor's testimony was believable as to his being "rolled" by a woman in his hotel room in Madrid, Spain, and being robbed of the sum of $4,000.00. It is believable that the debtor carried large sums of cash to facilitate his buying of military antiques— his business in Georges Mills, New Hampshire. Further, I find that the debtor was in Madrid, Spain, at the time that he claimed that he was, notwithstanding the lack of a stamp on his passport.

As for the gambling losses in London, the court generally finds that the debtor's testimony was credible. That is, the court believes that the debtor did gamble and did suffer losses during trips to London casinos in late 1984 and early 1985. However, the debtor could not provide any detailed accounting of his gambling losses, beyond the generalized explanation described above.

Thus, while the court does believe that the debtor *had* theft and gambling losses in Spain and England during November 1984 through January 1985, the real question is whether this explanation, although credible and believed by the court, is adequate to satisfy the explanation requirements of § 727(a)(5).

The problem of "undocumented" theft and gambling losses claimed by a bankrupt debtor is especially troublesome to creditors and to bankruptcy courts because of the ease with which any debtor can make such claims to explain away a substantial discrepancy in his assets at the time of the bankruptcy filing.[1] This has led some bankruptcy courts in such cases, or analogous "undocumented loss" cases to deny discharge on section 727(a)(5) grounds, on the basis that the debtor has failed to satis-

---

1. In prior cases the undersigned Judge has determined such claims not to be credible, and has denied discharge on that basis, and has seen subsequent F.B.I. investigations uncover the cash in question not "lost" but safely deposited in an unscheduled and undisclosed bank account held by the debtor.

factorily explain the loss of cash assets in the absence of documentation or with only a "vague and generalized" explanation of the loss. *See, e.g. In re Delancey,* 58 B.R. 762, 769 (Bankr. S.D.N.Y.1986); *Matter of Ramos,* 8 B.R. 490 (Bankr. W.D.Wisc.1981); *Matter of Reed,* 700 F.2d 986, 993 (5th Cir.1983); *In re Chalik,* 748 F.2d 616 (11th Cir.1984).

The plaintiff here would have the court read those decisions as establishing as a matter of law that *undocumented* theft or gambling losses *necessarily* results in a § 727(a)(5) violation when the debtor has only his oral testimony to explain such loss of assets. Put more bluntly the plaintiff quotes the comment in the case of *In re Switzer,* 55 B.R. 991, 998 (Bankr.S.D.N.Y. 1986), in the undocumented loss context that the trustee and creditors "should not be required to take the debtor's word that he no longer has these assets."

■ I do not believe the case decisions—or the statute for that matter—can be stretched that far. Notwithstanding the understandable consternation of creditors in a bankruptcy proceeding to learn that their defaulting debtor also claims he has no assets left because he squandered them in gambling and other improper activities, Congress has simply not seen fit to make squandering of assets or "improper activities" a ground for denial of discharge under § 727 of the Bankruptcy Code. Section

727(a)(5) is narrowly drawn and has to do with only whether the debtor has satisfactorily explained what actually has happened to his assets, regardless of whether that disposition is deemed proper or improper.[2] In the present case I have determined that the debtor's explanation *is* credible and that the debtor *did* lose the monies in the incidents as to which he testified. The debtor has not produced any documentation or other direct corroboration of such losses, but I conclude in the entire context of the matter that such lack of documentation on these particular losses *in this particular case* does not take away from my finding of credibility as to his testimony. Cf. *In re Brown,* 56 B.R. 63, 66–67 (Bankr. D.N.H.1985). Left for another day is the situation in which the lack of documentation might destroy credibility.[3]

■ For all of the foregoing reasons, it is my opinion that the plaintiff has failed to establish the separate grounds for complete denial of discharge of this debtor pursuant to § 727(a)(5) of the Bankruptcy Code.

## CONCLUSIONS

The foregoing shall constitute findings of fact and conclusions of law by the court with regard to each of the above-styled adversary proceedings. Separate final

---

2. In a recent case in this court, *In re Riso,* 74 B.R. 750 (1987), this court commented "As for the alternative contention by Francis that Riso's discharge should be barred under § 727(a)(5) of the Bankruptcy Code, dealing with a failure to explain satisfactorily any loss of assets prior to the bankruptcy, I believe that that contention is also insufficient on the facts of this case and is based on a fundamental misconception as to the import of that alternative statutory provision. The statute does not require that the debtor make a *proper* explanation as to a *proper* disposition of the assets in question. *In re Nye,* 64 B.R. 759, 762 (Bankr.E.D.N.C.1986) ('the court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper.')"

3. With regard to gambling losses it has to be recognized that "in the real world" gamblers do not often require signed receipts from their bookies and/or dealers as to each gambling transaction. In my opinion, the court cannot fairly take the position that the debtor should have obtained receipts and records to establish his losses that everyone realizes would never normally be obtained—and upon the failure to produce the same ipso facto deny discharge on that basis alone. The issue always will come down to credibility of the debtor-witness in consideration of all the surrounding circumstances. As indicated in the text, it may well be that Congress should consider some denial of discharge in situations of debtors seeking bankruptcy discharge after incurring flagrant gambling losses, but the fact is that Congress has not yet chosen to do so. See *Bankruptcy Code,* §§ 523 and 727. It is of course well-established that the statutory provisions for denial of a bankrupt's discharge are to be narrowly construed. 4 *Collier on Bankruptcy,* § 727.01A (15th Ed.1987).

judgments in each of the adversary proceedings shall be entered accordingly.